**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

TRACY ANN MILLER,

CASE NO. 2:18-cv-11638

*Plaintiff*,

DISTRICT JUDGE DENISE PAGE HOOD
MAGISTRATE JUDGE PATRICIA T. MORRIS

*v*.

COMMISSIONER OF SOCIAL SECURITY,

*Defendant*.

_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (R. 14, 15)**

## I.  RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (R. 14), be **DENIED**, the Commissioner's Motion for Summary Judgment, (R. 15), be **GRANTED**, and this case be **AFFIRMED**.

## II. REPORT

### A.  Introduction and Procedural History

This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff Tracy Ann Miller's claim for Disability Insurance Benefits (DIB) under Title II, 42 U.S.C. § 401 *et seq.* (R. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred

1

to the undersigned Magistrate Judge. (R. 3). Currently before the Court are Plaintiff's and Defendant's cross-motions for summary judgment (R. 14, 15). Plaintiff has also filed a response. (R. 16).

Plaintiff filed her application for DIB in January 2015,[1] alleging onset on October 25, 2014. (R. 11 at PageID.55). Her claim was denied at the initial level on June 5, 2015. (*Id.* at PageID.132). After an administrative hearing was held at Plaintiff's request, (*id.* at PageID.79-115), Administrative Law Judge (ALJ) Theodore Kim issued a decision finding that Plaintiff had not been under a disability from her alleged onset date of October 25, 2014, through the date of the decision, August 3, 2017. (*Id.* at PageID.52-78). The Appeals Council denied Plaintiff's request for review.[2] (*Id.* at PageID.35-41). This action followed. (R. 1).

### B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or

---

[1] Although the ALJ states that Plaintiff filed her application on January 8, 2015, (*id.* at PageID.55), a letter from the Social Security Administration indicates that Plaintiff completed her application on January 13, 2015. (*Id.* at PageID.192-200). Neither party alleges any harm caused by this inconsistency, and I see none. The period of time at issue was between Plaintiff's alleged onset date of October 25, 2014, and the date of the decision.

[2] Plaintiff submitted additional evidence to the Appeals Council. (*Id.* at PageID.42-46). In the Sixth Circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, any "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision—the final decision of the Commissioner—the court can consider only evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered in substantial evidence review.

has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.*

### C. Framework for Disability Determinations

Under the Social Security Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).   The

Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528,

534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the

existence and severity of limitations caused by [his or] her impairments and the fact that

[he or] she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc.*

*Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered him or her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ found Plaintiff had not been under a disability from the alleged onset date of October 25, 2014, through the date of the decision, August 3, 2017. (R. 11 at PageID.55). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant period. (*Id.* at PageID.57). Next, the ALJ determined Plaintiff had the following severe impairments: depression; anxiety; post-traumatic stress disorder (PTSD); plantar fasciitis of the right and left heels; tarsal tunnel of the right and left feet; otalgia of the right ear; glomus tumor with conductive hearing loss and headaches; tinnitus; obesity; degenerative disc disease of the lumbar spine with stenosis and radiculopathy; and lower extremity peripheral neuropathy. (*Id.*). Additionally, she had as non-severe impairments tobacco use disorder and diarrhea. (*Id.* at PageID.58). She did not, however, have an impairment or combination of

5

impairments that met or medically equaled the severity of a listed impairment. (*Id.* at

PageID.58-61). Before proceeding further, the ALJ found Plaintiff had the RFC to perform

sedentary work as defined in 20 C.F.R. § 404.1567(a), except that she

> can occasionally push, pull, and/or operate foot controls with both lower
> extremities. The claimant can occasionally kneel, crouch, stoop, balance, and
> crawl. She can occasionally climb stairs and ramps, but never climb ladders,
> ropes, or scaffolds. She must avoid all exposure to unprotected heights and
> moving mechanical parts. The claimant can tolerate occasional exposure to
> dust, mists, gases, noxious odors, fumes, pulmonary irritants, and poor
> ventilation. She can tolerate occasional exposure to extreme cold, vibration,
> and wetness. She requires a work environment with no more than moderate
> noise. She is limited to hearing and understanding simple oral instructions.
> In addition, the claimant is able to understand, carry out, and remember
> simple instructions, make simple work related decisions, and frequently
> interact with supervisors, co-workers and the public.

(*Id.* at PageID.61-71). At steps four and five, the ALJ concluded that Plaintiff was unable

to perform any of her relevant past work, but that jobs she could perform existed in

significant numbers in the national economy—she could work, for example, as an

Addresser (14,000 jobs nationally); a Production Inspector (29,000 jobs nationally); or a

Packager (20,000 jobs nationally). (*Id.* at PageID.71-73). Thus, the ALJ determined that

Plaintiff had not been under a disability as defined in the Social Security Act during the

relevant time. (*Id.* at PageID.73).

### E.  Administrative Record

#### 1.  Medical Evidence

On October 29, 2014, Plaintiff saw Dr. Ilka Naumann at the Michigan Ear Institute

about the constant pulsatile tinnitus in her right ear that had begun two years prior. (*Id.* at

PageID.315). She also complained of palpitations, sharp pains in her right temple, and

6

frequent postnasal drainage that caused nausea and vomiting. (*Id.*). After a CT scan showed a mass in her right ear, further imaging revealed a glomus jugulare tumor. (*Id.* at PageID.316, 328). Plaintiff underwent embolization surgery on January 30, 2015, (*id.* at PageID.350-357, 401-409, 444-462, 777-779), which "was uncomplicated," although "[a]fterwards, she developed a mild facial nerve paresis, which resolved with steroids." (*Id.* at PageID.442). She was discharged on February 1, 2015. (*Id.* at PageID.433).

About five days later, Plaintiff went to the emergency room with post-operation pain and nausea; since her release, she had had a few episodes of vomiting and left-sided headaches. (*Id.* at PageID.433). The vomiting was thought to be caused by an antibiotic she had been prescribed after surgery, which she discontinued. (*Id.*). At the time she visited the ER, the headache had resolved and she had not vomited for more than a day and a half. (*Id.* at PageID.433). Plaintiff was admitted for a CT scan, which revealed no acute intracranial process and no definite evidence of sigmoid sinus thrombosis. (*Id.* at PageID.344-346, 441). She was instructed to abstain from strenuous activity and from lifting anything heavier than 10 pounds for two weeks, and to "continue following the postop ear instructions including no sneezing, no nose blowing, no lifting or straining." (*Id.* at PageID.429).

On February 18, 2015, Plaintiff followed up with her surgeon, Dr. Naumann. (*Id.* at PageID.396). Dr. Naumann noted that Plaintiff had "been doing quite well postoperatively but still complains of a quite significant headaches [sic]." (*Id.*). Imaging was negative for a dissection or stroke. (*Id.*). Plaintiff reported that she had found herself biting her tongue on the right "a bit," and Dr. Naumann observed a slight weakness of the right hypoglossal

nerve, but no fasciculations, and no evidence of injury to other cranial nerves. (*Id.*). The postauricular and canal incisions were healing well. (*Id.*).

About a month later, at a March 2015 appointment with her primary care physician, Dr. Brad Kloska, Plaintiff reported she had felt "overwhelmed" since the surgery, and was "having a lot of depression, anxiety," and insomnia. (*Id.* at PageID.540). Her mood and affect were anxious and tearful. (*Id.* at PageID.541). Plaintiff had also reported depression prior to discovery of her glomus tumor; she had presented to the Prescott Clinic in May 2014 with worsening depression that caused crying spells and "moderately limit[ed] activities." (*Id.* at PageID.392). Triggers included "family issues" and stress. (*Id.*). She had returned the next month with similar complaints, as well as sinus troubles, and had been prescribed Abilify, amoxicillin, Xanax, and Zoloft. (*Id.* at PageID.389-391). About four months later, at her first visit with Dr. Kloska, in September 2014, she had explained that she had been diagnosed with depression and started on medication, but she had stopped it on her own. (*Id.* at PageID.310). Dr. Kloska had then started her on Celexa. *See* (*id.* at PageID.311-312). As of March 2015, however, the Celexa wasn't working; she was considering counseling and medical marijuana. (*Id.* at PageID.540). She was still getting headaches and now also heard pulsating on her left side. (*Id.*). Dr. Kloska switched her to Effexor and suggested she call the Blue Care Network to see about counseling, noting she "[c]ould be having some element of PTSD from the brain surgery." (*Id.* at PageID.542). He thought she qualified for medical marijuana based on her recent brain surgery, depression, and anxiety. (*Id.*).

8

A few days later, Plaintiff returned for another follow-up with Dr. Naumann. Although she had "been doing quite well postoperatively," she was "not back to work and is upset." (*Id.* at PageID.476). Her step mother reported that Plaintiff had been in treatment for PTSD since the surgery; Dr. Naumann indicated that "there seems to be lots of family issues and dynamics leading to this." (*Id.*). Plaintiff was also concerned that she now heard pulsations in both ears, and continued to have headaches on her right temple "(incisional pain)." (*Id.*). Overall, Dr. Naumann believed Plaintiff had made an "excellent postoperative recovery" and "should return to work." (*Id.* at PageID.477).

In April 2015, Plaintiff reported to Dr. Kloska that after one month on Effexor, she was "[d]oing much better." (*Id.*). She was ready to go back to work, though she did not want "light duty" and was unable to take blood pressure or use a stethoscope in her right ear. (*Id.*). She continued to hear a pulsation and complained her right ear hurt; Dr. Kloska found "[s]cant dried blood" and a cerumen impaction in her right external ear canal. (*Id.* at PageID.537-538).

Between October 2014 and May 2015, Plaintiff made several visits to the Tawas Foot Clinic, where she saw Rod Wright, DPM. In October 2014, she explained she had had pain in both heels for two years, rated at a 9 out of 10. (*Id.* at PageID.337-338). Wright noted palpable pedal pulses in each foot, with warm skin temperature, intact sensation, and intact and symmetrical deep tendon reflexes. (*Id.* at PageID.338). She had some swelling in both feet, pain to palpation in both plantar medial heels and in heels with dorsiflexion of the ankle, tightness in the posterior calf muscles, and palpable contracture of the medial and central bands of the plantar fascia on both feet. (*Id.*). Wright diagnosed her with heel

9

spur syndrome with plantar fasciitis in both feet. (*Id.* at PageID.339). Plaintiff tried several treatment options over the next seven months, including an Ibuprofen prescription, shoe inserts, daily stretching exercises, physical therapy, a night splint, and time off work to rest. (*Id.* at PageID.339, 481, 485, 486, 488-505, 507). Although she felt some improvement at first using the shoe inserts, (*id.* at PageID.481), and Plaintiff partially met her goals after several weeks of physical therapy, (*id.* at PageID.488-505), she was still experiencing pain rated 7 out of 10 in May 2015, (*id.* at PageID.507). She then requested plantar fascia release surgery. (*Id.*).

Prior to surgery, in May 2015, Plaintiff visited consulting psychologist George Pestrue. (*Id.* at PageID.491). He recounted Plaintiff's statements at length, including that even after her surgery, she had a headache more days than not and shooting pain from a growing bump behind her right ear. (*Id.*). The headaches made her vomit and forced her to lie down. (*Id.*). She had tried going back to work the previous week, but had "only made it through five or six hours" before the pain and vomiting forced her to stop. (*Id.*). Further, because of her plantar fasciitis and tarsal tunnel syndrome, she could not be on her feet for more than an hour or walk "very far." (*Id.*). She also had depression and anxiety; "I used to be fun and outgoing, but now . . . [m]ost of the time I stay at home depressed and crying." (*Id.*). Every week she suffered three or four panic attacks, which were triggered by stress, during which her heart sped up and she felt hot, shaky, and nauseous. (*Id.*). She worried about her tumor growing back and when she would need surgery again, and about not being able to work. (*Id.*).

10

Plaintiff lived with her husband and son, and they took turns with chores. (*Id.* at PageID.493). She cooked "sometimes" and could do dishes, but did not do the laundry, because that was her son's chore, and her husband did almost all the shopping. (*Id.*). She had gone with him a few weeks prior, and "after a few minutes in the store [her] feet hurt so bad [she] had to stop." (*Id.*). But she said, "I can do any of the household chores when I don't have a headache and if I'm not on my feet too long." (*Id.*). She did not have any trouble driving; she had driven to the appointment and was on time. (*Id.* at PageID.494).

Plaintiff had two good friends; they went to each other's houses and spent time together. (*Id.* at PageID.493). She liked to fish on a boat and play cards, and because of her headaches and foot pain she spent a lot of time lying down and watching television. (*Id.*). Although she used to enjoy four-wheeling and playing basketball, she no longer could. (*Id.*).

On a typical day, Plaintiff got up around 6:30 AM. (*Id.* at PageID.493). She vomited every morning. (*Id.* at PageID.494). After her son got on the bus at 6:45 AM, she went back to sleep until 10:00 or 11:00 AM, then got up and called her mother. (*Id.*). Then she watched television and cleaned, or laid on the couch if she had a headache. (*Id.*). Around 1:00 or 2:00 PM she napped for an hour or two, and when her son got home at 4:00 PM, she helped him with his homework. (*Id.*). They made dinner, did dishes, and played cards, she might watch him play basketball or watch some television, until finally she went to bed around 1:00 AM. (*Id.* at PageID.493). She was "very restless" so it usually took "a good two hours to get to sleep." (*Id.*).

11

Pestrue remarked that Plaintiff's self-esteem "appeared to be rather poor," "her general motivation for many of life's usual activities appeared to be significantly limited in scope," and her mood was "strongly depressed"; she cried "mildly" off and on throughout the evaluation. (*Id.* at PageID.494). Her stream of mental activity was spontaneous, her responses to questions were generally reasonable, she was a good historian for personal information, and she was "friendly and cooperative" with the examiner. (*Id.*). She showed "adequate" contact with reality and fair insight. (*Id.*).

Pestrue diagnosed Plaintiff with Major Depression, Single Episode, Moderate; Panic Disorder; and Generalized Anxiety Disorder; "R/O [rule out] PTSD." (*Id.* at PageID.496). His prognosis was guarded. (*Id.*). He stated: "The client's depression leaves her tired and lacking in motivation. She believes that her medical problems are her primary disability." (*Id.*).

The next month, in June 2015, Plaintiff saw Craig Pilichowski, DPM, with pain rated 10 out of 10 in each foot. (*Id.* at PageID.672). He discussed her heel spurs, bursitis, plantar fasciitis, and sprain and strain of the tarsometatarsal; he gave her injections and home exercises and taped her feet. (*Id.* at PageID.674-675). Over the next three appointments, they continued to try taping, injections, and exercises. (*Id.* at PageID.669-671, 664-666, 661-663). The injections helped for "maybe two days," and though the pain subsided with rest and taping, it returned when the tape was removed. (*Id.* at PageID.661, 663). As of July 28, 2015, Plaintiff continued to demonstrate normal muscle strength in both lower extremities, intact light touch and sharp/dull sensation, and a normal range in motion in both ankles, but also pain and swelling in both feet. (*Id.* at PageID.661-663). In

12

August 2015, she explained at a pre-operation appointment that the pain had "gotten to the point of being intolerable and she would like to get back to normal activities, work, and taking care of her child." (*Id.* at PageID.659). She had a limp on the right side. (*Id.*).

Imaging of her lower extremities done in July 2015 showed (1) increased activity in the right and left calcaneus, "possibly related to" plantar fasciitis and Achilles tendinitis, respectively; and (2) increased activity in the bilateral ankles and mid feet, left greater than right, which could have been related to degenerative changes, inflammation, or fracture. (*Id.* at PageID.577).

On August 14, 2015, Plaintiff underwent a plantar fascial release on her right foot. (*Id.* at PageID.598-599). Five days after the operation, Plaintiff was still in quite a lot of pain, but the incision appeared to be "healing perfect," and her activity level had improved. (*Id.* at PageID.656). Seventeen days after surgery, her symptoms had improved 60% from prior to surgery, and the post-operation pain had been persistent but mild. (*Id.* at PageID.654). Pilichowski discussed different types of orthotics with Plaintiff, and dispensed a pair she liked and found comfortable. (*Id.*). By September 15, 2015—about a month after the surgery—Plaintiff was "actually very well on the right side," but limped on the left due to 7 out of 10 pain and swelling from the plantar fasciitis in that foot. (*Id.* at PageID.651-653).

That same month, Plaintiff returned to Dr. Naumann, who had performed her tumor surgery. (*Id.* at PageID.513-514). She had not yet returned to work because of her recent surgery for plantar fasciitis on her left foot and upcoming surgery on the right. (*Id.* at PageID.513). Plaintiff denied headaches and nausea. (*Id.*). Dr. Naumann ordered a CTA to

assuage Plaintiff's worries about her bilateral pulsatile tinnitus; the tumor showed no signs of recurrence. (*Id.* at PageID.513-514, 516-517).

On September 22, 2015, Plaintiff underwent the same plantar fascial release on her left foot. (*Id.* at PageID.594-596). Her pre-operative notes indicated she was not working due to foot pain, but that her right foot's plantar fasciitis had resolved after surgery, with no pain on ambulation. (*Id.* at PageID.596-597). One week after her left-foot surgery, Plaintiff's symptoms were already "much improved," with mild post-operative pain. (*Id.* at PageID.629). Plaintiff did complain, however, of peripheral neuropathy and back pain exacerbated by walking and standing, and a physical examination noted diminished light touch sensation on the right side and from her lower leg to toes. (*Id.*). Pilichowski ordered an x-ray of her lumbar spine, (*id.* at PageID.631), which showed mild degenerative change of the lumbar spine without fracture, (*id.* at PageID.574).

By November 2015, two months post-operation, her symptoms had improved compared to before the operation, but her post-operative pain had been severe: she suffered burning, tingling, and shooting pain in her back and right thigh, calf, and foot, rated at 5 out of 10 on average and 7 at the time. (*Id.* at PageID.626). The pain worsened with walking and standing, although her gait and posture were normal. (*Id.* at PageID.627).

Plaintiff also sought help for her headaches from multiple sources. In September 2015, Plaintiff had a new patient visit for an eye examination for her headaches at the Great Lakes Eye Institute. (*Id.* at PageID.582). The physician assured her that her optic nerves were healthy and free from edema, with no evidence of elevated intracranial pressure

present from an ocular standpoint. (*Id.*). He recommended she wear glasses full-time because her uncorrected vision could be contributing to her headaches. (*Id.*).

In addition, the record contains an October 2015 appointment with neurologist Dr. Meihui Ma for Plaintiff's headaches. (*Id.*). Dr. Ma observed Plaintiff to be a "very pleasant lady" who was "not in acute distress." (*Id.*). She was alert and oriented times three, her speech was fluent and comprehensive, her language exam was normal, she evinced no dysarthria and no recent or remote memory problems, her attention and concentration were normal, and her fund of knowledge was appropriate. (*Id.*). Her main concern was her headaches, which occurred about four days a week, and felt like a "pulsating, constant headache" with "jolting, electric, sharp sensations." (*Id.* at PageID.580). Dr. Ma prescribed Elavil and asked Plaintiff to return in one month; the record contains no further appointments with him. (*Id.*).

And Plaintiff saw Dr. Kloska for a severe headache on several occasions: October 22, 2015, (*id.* at PageID.525) (bad headache for three days around right temple); December 11, 2015, (*id.* at PageID.520) (the worst headache she had ever had); September 13, 2016, (*id.* at PageID.699) (headache lasting ten days).

In early March 2016, Plaintiff complained to Dr. Kloska of headache, fever, chills, and cramps in her right low abdomen, with pain that went down her leg and into her back. (*Id.*). Her husband had noticed blood in her right ear; Dr. Kloska observed that her right external ear canal was swollen and erythematous, with an abrasion on the bottom of the ear canal, but no bleeding. (*Id.* at PageID.604). He prescribed antibiotics for her ear, fever, and cough. (*Id.* at PageID.605). After a pelvic ultrasound was unremarkable, Dr. Kloska

15

referred Plaintiff to the women's center, but Plaintiff apparently missed her first appointment and no others appear in the record. (*Id.* at PageID.606-607, 610).

Later in March 2016, Plaintiff saw Dr. Mark Adams about a potential lumbar herniated disc causing sharp, stabbing, and aching pain in her lumbar area, with radiation to her lower extremities and numbness. (*Id.* at PageID.613). Plaintiff did not appear in any distress. (*Id.* at PageID.613-614). She had a slow gait with diminished sensation, deep tendon reflexes 1/4, and no clonus; a straight leg raising test was "more pos[itive]" on the left. (*Id.* at PageID.614). Dr. Adams noted "some weakness" in the upper and lower extremities, "maybe effort dependent," and planned to order more imaging. (*Id.*).

In fall 2016, Plaintiff's glomus tumor recurred, necessitating a second surgery. (*Id.* at PageID.696-698, 727, 733). In the days leading up to the surgery, Plaintiff suffered increased anxiety and panic attacks, for which she was given Xanax. (*Id.* at PageID.696, 698, 694-695). She was also given oxycodone, to be used for severe headaches only. (*Id.* at PageID.694-695).

After Dr. Naumann performed Plaintiff's second surgery for her glomus tumor in late January 2017, she penned a letter to Dr. Kloska describing the surgery as "quite uneventful." (*Id.* at PageID.703). She had examined the incision and found it clean, dry, and intact, and asked Dr. Kloska to remove the sutures in several weeks' time. (*Id.*). Plaintiff's cranial nerves were "completely intact" and she was reportedly "quite pleased at not only her nerves but that also her sigmoid sinus were still in place." (*Id.*). Dr. Naumann expected she would need an MRI scan in 6 to 12 months and said they would "consider Gamma Knife radiosurgery for any recurrent tumor growth in the future." (*Id.*).

16

In February 2017, Dr. Kloska removed the requested sutures and noted the wound was "well healed with no sign of infection." (*Id.* at PageID.689-690). He also renewed Plaintiff's oxycodone prescription. (*Id.* at PageID.690).

About a week later, Dr. Scharf noted that Plaintiff's incision was well-healed, she had "no significant pain," and she had "intermittent pulsatile tinnitus on the left side." (*Id.* at PageID.775). Dr. Scharf stated she would be a candidate for gamma knife radiation therapy in the future and that he would see Plaintiff back with any acute difficulties. (*Id.*).

The following month, on March 8, 2017, Dr. Kloska completed a Medical Source Statement for Plaintiff. (*Id.* at PageID.776). He checked boxes indicating that "Depression/Bipolar" and Anxiety affected Plaintiff's symptoms and functional limitations. He expected she would experience pain from headaches or side effects from medication sufficiently severe to put her off-task three or more hours in an eight-hour workday. (*Id.*). She would need to lie down hourly for severe headaches and would be absent more than three times a month. (*Id.*). Plaintiff had been off work since October 2014; Dr. Kloska saw "[n]o return in site [sic] due to unresectable glomus tumor." (*Id.*). He gave her a guarded prognosis "due to [the] tumor touching her carotid." (*Id.*).

### 2. Application Reports and Administrative Hearing

#### i. Plaintiff's Function Report

Plaintiff completed an adult function report on February 24, 2015. (R. 11 at PageID.226-238). "With all going on I have depression and anxiety really bad." (*Id.* at PageID.231). Her glomus tumor had required two surgeries in January 2015. (*Id.*) She could not hear well from her right ear. (*Id.*). Her tongue "ha[d] some paralysis." (*Id.*).

Additionally, she had "horrible headaches and pain that shoots through the right side of [her] head,"—pain that "comes whenever it wants and I yell out it hurts so bad"—so that she could not even "lay on right side [without] being in pain." (*Id.*). Because she was "very restless" and found it hard to get comfortable, she was not able to get much sleep at a time. (*Id.* at PageID.231-232).

 On an average day, Plaintiff would get up, go to the bathroom, watch "a lot" of TV, and—on a good day—do a few dishes or put something in the slow cooker. (*Id.* at PageID.232). She did not drive often, so she usually stayed at home, laid down, and watched TV. (*Id.*). Her son was almost 11 years old and could do "most" on his own, but she did cook for him and help him with spelling; her husband helped him with his other homework. (*Id.*). She also let the dog out, but her son and husband handled the other responsibilities of taking care of their pets. (*Id.*). Before onset, she had been able to "[b]e happy, not be sad all the time. Clean, clean, clean, enjoy life without pain or depression," and she "used to drive a lot and spend lots of time [with people]." (*Id.*).

Plaintiff could handle all her personal care on her own, including dressing, bathing, caring for her hair, shaving, feeding herself, and using the toilet, although how long it took her depended on the pain in her head. (*Id.*). She did not need reminders to tend to her personal needs or to take her medicine, but her husband helped her administer four drops of medication in her right ear twice a day. (*Id.* at PageID.233).

When it came to preparing meals, she and her husband "work[ed] as a team, depending how feeling who cooks [sic]." (*Id.*). She cooked "lots of slow cooker meals and enough for a [couple] days," like "regular chicken," hot dogs, or baked potatoes, or she

18

would cook "frozen complete meals" on the stovetop. (*Id.*). As for chores, her husband did the yardwork, she or her son vacuumed, and her son washed the laundry, which her husband then put away. (*Id.*). How long she could do the dishes depended on how she was feeling, while vacuuming took about ten minutes. (*Id.*).

In winter she "hardly ever" left the house because the cold "feels like needles to the right side" of her head, while in summer she might go out "depend[ing] on what's going on." (*Id.* at PageID.234-235). She did not play sports or swim, but she would sit with people around a fire or on the deck to watch her son swim, or go out on a boat to fish. (*Id.* at PageID.234). Although her husband would drive when he was home, Plaintiff could drive unless the pain in her head was bad. (*Id.*). Turning her head to look over her shoulder pulled on her neck and caused pressure in her ear. (*Id.*). Her mother drove her to her appointments in Novi. (*Id.*).  Plaintiff's husband did all the shopping. (*Id.*). She had not gone shopping in a long time, but if she had to, she shopped at the nearest Walmart. (*Id.*).

For hobbies, Plaintiff enjoyed watching TV, fishing, playing cards, and spending time with her family. (*Id.* at PageID.235). She did these things "ok," depending on how she was feeling. (*Id.*). On a daily basis, she spoke with her parents by phone, and she went to their house about once a week. (*Id.*). Otherwise, the only place she went on a regular basis was to medical appointments. (*Id.*). She had no problems getting along with others or with authority figures. (*Id.* at PageID.236-237).

Her impairments affected her abilities to lift, hear, and talk (though she clarified: "not so much talking but my tongue hangs to the right and I'm constantly chewing or biting it"). (*Id.* at PageID.237). She had a tumor attached to her "middle ear," and lifting caused

19

"lots of pressure and popping" in her ear. (*Id.*). Asked how long she could walk before needing to stop and rest, she put a question mark and wrote, "getting longer and better weekly since surgery."[3] (*Id.*). How long she could pay attention "depends"—she "zone[d] out a lot." (*Id.*). She indicated that she did not finish what she started, and explained, "Once in a while I forget what I'm talking [about] but that's just me. I mess up or say things that don't make sense sometimes but [people] understand me." (*Id.*). She followed written instructions well and spoken instructions well if she understood them. (*Id.*).

Stress caused her to "break down and cry," and she reported having "a lot of stress, that falls into the depression and anxiety I have." (*Id.* at PageID.237). She did not like change (adding, in parenthesis, "OCD"), and explained that she was "very emotional," "being treated for depression bipolar" and that "at any time" she could "just break down and cry." (*Id.*). She marked that she had worn glasses since she was little, but did not indicate using or needing any ambulation aid, including a cane, walker, or wheelchair. (*Id.*). Her Tylenol with codeine caused side effects of constipation and tiredness. (*Id.* at PageID.238). Her pain medication did not "touch the shooting pain or the weird feeling right side of head." (*Id.* at PageID.238).

In conclusion, Plaintiff indicated that she had had embolization surgery on January 28 and ear reconstruction surgery on January 30 (less than a month prior), and had been readmitted on February 6 for testing for "drainage and headaches and so much pain." (*Id.*). Her surgery "went way better than expected," but she still suffered from "lots of pain and

---

[3] Her report was dated about a month after her first surgery for her tumor.

soreness and headaches," as well as diminished hearing in her right ear and "some issues" with her tongue. (*Id.*). She had been on two medical leaves from work: one for surgery, and one for her depression. (*Id.*).

### ii.  Third-Party Function Report

Plaintiff's husband, Jacob Edward Miller, completed a third-party function report for her on February 25, 2015. (*Id.* at PageID.239-250). He explained that her ability to work was limited due to her frequent headaches, mood swings, and sharp pains in her head. (*Id.* at PageID.239). Plaintiff passed an average day by watching TV, napping, and doing dishes. (*Id.* at PageID.244). She also cooked for her son and let the dog out to go to the bathroom. (*Id.*). Otherwise, her husband and her son helped with the pets. (*Id.*). Prior to onset, Plaintiff had been able to work and lift more than 25 pounds, and had been happier and more social. (*Id.*). Her sleep was troubled due to the pain in her head and restlessness. (*Id.*).

Corroborating Plaintiff, her husband indicated she had no problem with her personal care, and did not need any special reminders about her personal needs or medicine. (*Id.*). Her cooking habits had not changed since onset; she prepared easy meals daily, sometimes in the slow cooker. (*Id.* at PageID.245). If she did not feel well, he would cook instead. (*Id.*). Plaintiff spent about 15 minutes daily doing chores like dishes and sweeping. (*Id.*). She could drive, "depending on headache." (*Id.* at PageID.246). Her hobbies included watching TV, playing cards, fishing, and camping, and she watched more TV now than she had before. (*Id.* at PageID.247). She spent time with her family in person and talking on the phone. (*Id.*). Medical appointments were her only other regular outing. (*Id.*). Since

onset, she ventured out less often. (*Id.* at PageID.248). Plaintiff's husband noticed her impairments affected her abilities to lift, reach, and hear. (*Id.*). Asked how long she was able to walk before resting, he wrote only, "Getting better." (*Id.*). She followed written and spoken instructions "OK." (*Id.*). She did not handle stress well, as it made her cry. (*Id.* at PageID.249). Like Plaintiff, he indicated that she wore glasses, but did not need any ambulatory aids. (*Id.* at PageID.249). Her Tylenol had the side effect of making her sleepy. (*Id.* at PageID.250).

He closed: "My wife has had a hard year." (*Id.*)

### iii.  Letter from Plaintiff's Mother

Plaintiff's mother, Teri Kubik, submitted an undated letter. (*Id.* at PageID.263). She explained that when Plaintiff had been working as a CNA in 2014, "her feet hurt her so bad she would call [her mother] when she was at work and tell [her mother] how much pain she was in." (*Id.*). "When she would wake up she would crawl to the bathroom cause her feet hurt too bad to stand on them." (*Id.*). Her mother also described a day when the family was "doing something in the backyard" and Plaintiff wanted to help, but could only sit and watch because her feet hurt. (*Id.* at PageID.264-265). Plaintiff's family had bought her "wedges for her shoes," but they did not seem to help. (*Id.* at PageID.263). The pain made Plaintiff depressed and she began having anxiety attacks, for which she needed medication. (*Id.*).

In spring or summer 2014, Plaintiff saw various physicians about "a pulse in her ear." (*Id.* at PageID.264). Two were unconcerned, but an ENT "took her off work and arranged surgery" for a tumor. (*Id.*). The looming surgery only caused Plaintiff more

22

anxiety, and she called her mother daily, "crying with her fears." (*Id.* at PageID.264). Even after the surgery, "the pulse" and headaches persisted, and the pain was severe enough to make her vomit every day. (*Id.*). Plaintiff also had trouble sleeping, and often called her mother "to let [her] know how bad she is feeling." (*Id.*).

At the time her mother penned the letter, Plaintiff had an upcoming appointment with the surgeon because "it isn't normal this many months after surgery to still have the pulse and very bad headaches." (*Id.*). Because Plaintiff's tumor would grow back—which caused Plaintiff more anxiety—it would need to "be watched for the rest of [her] life." (*Id.*).

Plaintiff had tried to return to work, but was always sent home "after a couple hours" because of the "extreme" pain in her head and feet. (*Id.* at PageID.265). Her mother says that while Plaintiff "use[d] to be bubbly and full of life," and used to visit frequently, now she was depressed and anxious, and stayed at home. (*Id.*).

### iv.  Plaintiff's Testimony at the Hearing

An administrative hearing was held in Plaintiff's case on April 20, 2017. (*Id.* at PageID.79-115). Plaintiff was 30 years old at the time of the hearing. (*Id.* at PageID.84). She had completed high school and earned a CNA certification, which she had since lost due to her medical issues. (*Id.*). Plaintiff had last worked in May 2015, when she went back to work for about a week and a half but was sent home because of her foot pain and headaches. (*Id.* at PageID.85). Before that, she had last worked in October 2014, as a CNA, for a span of about two years. (*Id.*). Her job required her to stand and to lift the weight of a client with the help of two personal assistants and a Hoyer lift. (*Id.* at PageID.85-86).

23

Before that, she had served as a nanny for her niece from when she was a newborn until the age of two. (*Id.* at PageID.86). Her niece had weighed at most 15 pounds. (*Id.*). Prior to working as a nanny, she had worked the night shift as a home healthcare aide at Roll Aways for "a matter of months." (*Id.*). Her duties had included cleaning and giving patients their medication in the morning. (*Id.*). Previously she had spent about a year at River's Bend, a rehabilitation center for brain injuries, again on the third shift, where she cleaned, passed out pills, and helped patients if they needed anything. (*Id.* at PageID.87). From 2006 to 2008, she had worked a similar job at an adult foster care facility. (*Id.*).

Currently, her ability to work was limited by "extreme headaches, so much pressure," deafness in her right ear, and "permanent nerve damage to [her] feet because of the scar tissue from the tumor" in her head. (*Id.* at PageID.88). Surgery could not correct her feet, and the pain would be lifelong. (*Id.*). During her testimony, Plaintiff pushed on her jugular vein to help relieve the sound of her pulse in her left ear, which otherwise was an "annoying, consistent" "pow, pow, pow." (*Id.* at PageID.88-89).

When Plaintiff had first complained of a pulse in her ear, she had been treated for an ear infection for five months before a CT scan revealed the tumor. (*Id.* at PageID.91). Her first surgery had been in January 2015. (*Id.* at PageID.90). Plaintiff showed the ALJ that she had an 8-inch scar circling ear to ear and going to near her Adam's apple; she explained that for surgery, "[t]hey had to move my esophagus and everything, they cut all my neck muscles." (*Id.* at PageID.89). During the first surgery, Plaintiff had had a stroke; but she testified that she had no residual problems, except that her "tongue is just a little bit to the right." (*Id.* at PageID.92).

24

Part of the tumor could not be removed because it was growing in her carotid artery. (*Id.* at PageID.89). The tumor would continue to grow, so Plaintiff underwent CT scans every six months or so, and would need further surgeries or radiation. (*Id.*). Indeed, a follow-up CT scan 20 months after her first surgery showed the tumor had grown and Plaintiff would need another surgery, which Plaintiff underwent on January 30, three months prior to the hearing. (*Id.* at PageID.92). Her surgery team also "had to take the inner parts" of her right ear out and close it with a skin graft, so she was permanently deaf in her right ear. (*Id.* at PageID.93).

Bending "or anything like that" caused her pulse to "get[] extremely loud" and her head to pound, and the effect had gotten worse since her second surgery. (*Id.* at PageID.91, 93). Plaintiff also vomited every day due to "overactive sinus drainage" or pain from her headaches. (*Id.* at PageID.90). During her first surgery, "they had to scrape all the sinuses and all my nerves on the side of my face, so they thought the puking might stop," but it had not. (*Id.*). Though she had no facial paralysis, the nerve scraping resulted in shooting pains through her head. (*Id.* at PageID.94). The pounding in her head was more intense if she sat up, so she spent most of the time lying down. (*Id.* at PageID.97). But she found sleeping "very hard" and it took her hours to fall asleep because pain prevented her from lying on the right side of her head. (*Id.* at PageID.89).

For her foot pain, Plaintiff had had plantar fasciitis surgeries in August and September 2015, but the pain remained. (*Id.* at PageID.95). Then a scan revealed that the tumor "lays on the nerve that runs from [the] head down to [the] feet," which also caused shooting pains from her feet to the back of her calves. (*Id.* at PageID.94-95). An EMG test

25

confirmed that nothing in her back was causing the nerve damage. (*Id.* at PageID.95). Plaintiff testified that surgery could not correct the issue; it would be lifelong. (*Id.* at PageID.94). After about ten minutes of standing, the pain in Plaintiff's feet would be so intense she could no longer put weight on them, and she would "just crawl around like a toddler at the house." (*Id.* at PageID.97).

Plaintiff was also being treated for depression and anxiety. (*Id.* at PageID.98). She explained she felt depressed because "my life is so different than it used to be and I never know what my next scan is going to be of my head and he [her husband] has to work his butt off for nothing because I can't work." (*Id.*). Further, they were $30,000 in debt because she had been unable to work for two years. (*Id.* at PageID.98). She also had "really bad" anxiety brought on by her and her husband's medical issues. (*Id.* at PageID.98-99).

For her headaches and nerve pain, Plaintiff took one 15-milligram pill of Oxycodone every day, as well as Excedrin Migraine and Xanax for her anxiety. (*Id.* at PageID.97-98).

Around the house, Plaintiff could do the dishes if she did not have a headache, sitting on a barstool so she did not have to stand. (*Id.* at PageID.99). If she could not finish the dishes, her son or husband would help. (*Id.*). She might move the laundry from the washer to the dryer, "depending on [her] head," and her son took it out of the dryer. (*Id.*). Her husband did an estimated 95 percent of the grocery shopping because "walking around will just cause pain in my feet, so that I'll have to crawl around the house." (*Id.*). So long as she had not taken her medication, which made her "so relaxed," she could drive. (*Id.*). When riding as a passenger in a car, she always put her feet up on the dashboard to avoid "hav[ing] to constantly pick them up or move around because there's like weights on them

26

and it just pulls." (*Id.* at PageID.99-100). She estimated she could walk for about ten minutes at a time; when standing, she would not stand still but would "always prance" or sit down. (*Id.* at PageID.100). She did not climb stairs because they irritated her feet. (*Id.* at PageID.100-101). About 10 pounds was the maximum she could comfortably lift and carry, especially if she needed to bend over to lift it, because bending "just makes that pressure in my head and my pulse go crazy and tense from the pounding." (*Id.* at PageID.101).

As Plaintiff's husband and son liked to fish, she had gone with them about 12 to 15 times the previous year. (*Id.*). During warm weather, they tried to go about once a week, on a day when Plaintiff did not have a headache, to fish at a spot 12 miles from their home. (*Id.* at PageID.101-102). Plaintiff laid down in the boat "all the time." (*Id.*).

### v. The Vocational Expert's Testimony at the Hearing

Vocational Expert (VE) Richard Reidel also testified at the hearing. (*Id.* at PageID.103-114). The VE classified Plaintiff's past work as a nurse assistant (medium work, performed at heavy or very heavy, semiskilled, SVP 4); home attendant (medium, performed at light, semiskilled, SVP 3); and child monitor (medium, performed at light, semiskilled, performed as unskilled, SVP 3). (*Id.* at PageID.106-107).

The ALJ then posed his first hypothetical:

[A]ssume an individual of the claimant's age, education and work experience, can perform work at the light exertional level as defined by the regulations, except the individual can frequently push or pull or operate foot controls with both lower extremities; also assume that the individual can occasionally kneel, crouch, stoop, balance, and crawl; can occasionally climb stairs and ramps; can never climb ladders, ropes and scaffolds; and can never be exposed to unprotected heights and moving mechanical parts; assume that

27

the individual can have occasional exposure to dust, mists, gases, noxious odors, fumes and pulmonary irritants and poor ventilation; assume the individual can tolerate . . . occasional exposure to extreme cold, vibration and wetness; the individual will require some moderate noise level or confinement; the individual is limited to hearing and understanding simple, oral instructions. In addition, assume that the individual is able to understand, carry out and remember simple instructions, make simple work related decisions and frequently interact with supervisors, coworkers and the public.

(*Id.* at PageID.107-108). The VE noted that this was "summarizing light, unskilled work, simple instructions, et cetera." (*Id.* at PageID.108). He explained that the *Dictionary of Occupational Titles* did not directly address how instructions are received or the frequency of working with people; what the *DOT* did not address, the VE based on his 40 years of experience. (*Id.* at PageID.108-109). Of Plaintiff's previous work, only the child monitor job would remain available to someone with the above RFC. (*Id.* at PageID.109). Additionally, that person could perform other jobs including office helper (333,000 nationally); production inspector (reduced to 65,000 nationally); and packager (reduced to 230,000 nationally). (*Id.* at PageID.109-110).

For the ALJ's second hypothetical, he further limited the hypothetical person to occasionally pushing or pulling or operating foot controls with both lower extremities. (*Id.* at PageID.110). The VE's answers remained unchanged. (*Id.* at PageID.110-111).

The third hypothetical built off the second, but restricted the person to the sedentary exertional level. (*Id.* at PageID.111). With that restriction, all Plaintiff's past work would be precluded. (*Id.*). But other jobs would be available: addresser (140,000 nationally); production inspector (29,000 nationally); and packager (20,000 nationally). (*Id.* at PageID.111-112).

28

Fourth, the ALJ asked whether the VE's answer to any of the previous hypotheticals would change if the person "in addition to normal scheduled breaks would require additional hourly breaks to lie down, resulting in the individual being 30% off task," would be absent from work four or more days per month, and would require "a quiet work environment." (*Id.* at PageID.112). According to the VE, exceeding 10 percent of time off-task or being absent an average of more than one day per month would each be work preclusive. (*Id.* at PageID.113).

After confirming that the hypothetical person was limited to frequent contact with coworkers and supervisors, but without specifying a particular hypothetical, Plaintiff's attorney asked the VE: "Is that basically unskilled work then?" (*Id.* at PageID.113-114).

The VE hesitated: "I don't quite understand that." (*Id.*)

"In other words," the attorney persisted, "could an unimpaired mentally—I don't mean, maybe I'm stretching the envelope, but could a person who is not unimpaired mentally perform that work?" (*Id.*).

"Yes, I believe so," the VE replied. (*Id.*). That concluded the VE's testimony.

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. §§ 404.1513 (amended March

27, 2017), 416.913 (amended March 27, 2017).[4] "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* §§ 404.1513(a), 416.913(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* §§ 404.1513(d), 416.913(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. §§ 404.1527 (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927 (eff. Aug. 24, 2012 to Mar. 26, 2017). Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* §§ 404.1527(d), 416.927(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. *Id.* §§ 404.1527(c) (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927(c) (eff. Aug. 24, 2012 to Mar. 26, 2017). The test looks at whether the

---

[4] SSR 06-03p was rescinded effective March 27, 2017, and 20 C.F.R. § 404.1513 was updated as of March 27, 2017. The new regulation is effective for cases filed on or after March 27, 2017; because Plaintiff filed for DIB in January 2015, I consider her case under the old rule.

source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed her claim before March 27, 2017, she is entitled to the benefit of the treating-source rule. Under that rule, certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. §§ 404.1527(d), 416.927(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it

31

lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

The claimant must provide evidence establishing his or her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

In accordance with SSR 16-3p, an ALJ must analyze the consistency of the claimant's statements with the other record evidence, considering his or her testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in the Social Security Ruling. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). This analysis and the conclusions drawn from it—formerly termed a credibility determination[5]—can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc.*

---

[5] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has remained materially unchanged, *see* 20. C.F.R. § 404.1529(c), and I agree with the courts in this District that have continued to apply SSR 96-7p to cases arising prior to its rescission. *See, e.g., Cooper v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL 2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July 7, 2017).

*Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR. 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071) (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). The absence of objective, confirming evidence obligates the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measure . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3), 416.929(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

### G. Analysis

Plaintiff argues the ALJ's decision cannot stand because: (1) the ALJ improperly analyzed the opinion of treating physician Dr. Kloska; (2) the RFC failed to account for Plaintiff's mental impairments; and (3) the ALJ did not consider the letter from Plaintiff's mother.

### 1. Treating Physician Opinion

To begin, Plaintiff takes issue with the ALJ's treatment of the opinion from treating physician Dr. Kloska. As explained above, Dr. Kloska completed a one-page Medical Source Statement in March 2017 indicating that Plaintiff's diagnoses were glomus tumor, depression, anxiety, and "vomiting and headache." (*Id.* at PageID.776). Her headaches or side effects from medication would cause her to be off-task three or more hours during a competitive 8-hour workday, and she would need to lie down hourly for severe headaches. (*id.*). She would be absent more than three times a month. (*Id.*). Dr. Kloska saw no return to work in sight, due to her tumor. (*Id.*).

The ALJ acknowledged that Dr. Kloska was a treating provider, but gave his opinion little weight because it was "inconsistent with the treatment notes from ear nose and throat specialist[] Dr. Scharf[ from] just a month earlier" and with Dr. Naumann's assessment, as well as with physical examinations showing a plethora of normal results. (R. 11 at

34

PageID.67). Rather, "Dr. Kloska's statement of debilitating[6] limitations seems based substantially on the claimant's own subjective assessment," which the ALJ discounted. (*Id.*). Plaintiff has not challenged the credibility finding. Additionally, the ALJ noted that whether Plaintiff was able to work was a determination reserved to the Commissioner. (*Id.*). Plaintiff contests whether these are good reasons to discount Dr. Kloska's opinion.

### i.   Inconsistency with Physical Examinations

First, Plaintiff reproaches the ALJ for relying on a "cookie cutter," "one-size-fits-all" analysis of the issues throughout his opinion, including here. (R. 14 at PageID.796). The ALJ stated that Dr. Kloska's assessment was inconsistent with physical examinations from "the relevant period" that showed

> no acute distress; no abnormalities of the neck, thyroid, lungs, heart, abdomen, or lymphatic system; normal pedal pulses; warm skin; normal and symmetrical pinprick, vibration, light and temperature sensation; normal deep tendon reflexes; normal posture; no muscle wasting, edema, cyanosis, or clonus; intact crania nerves; no tremors; no atrophy; normal motor strength in the upper and lower extremities; normal coordination; ability to tandem walk; negative Romberg; and normal gait.

(R. 11 at PageID.67) (citing 481-482, 483-484, 613-614, 616-618, 653, 692-694). As Plaintiff observes, the ALJ repeats this litany of physical examination findings verbatim at

---

[6] Plaintiff takes umbrage with the ALJ's use of the word "debilitating." (R. 14 at PageID.797) ("Dr. Kloska never did 'suggest that her condition was debilitating.'"); (R. 16 at PageID.874 ("It also appears this ALJ has his own standard for discounting treating source opinions by requiring evidence from other treating physicians to be 'debilitating.' Plaintiff would like to know where in the Commissioner's Regulations the 'debilitating' standard is found? This is clearly an amorphous or unmeasurable standard that should not be tolerated in any Social Security context. . . . The 'debilitating' standard lacks substantial evidence."). From context, it seems evident to this reader that the ALJ was simply using "debilitating" as a synonym for "disabling," as Dr. Kloska had opined that Plaintiff's impairments rendered her unable to work, but Dr. Naumann and Dr. Scharf had not. The ALJ properly articulated the standard for finding disability under the Social Security Act. (R. 11 at PageID.56-57).

35

six other places in his opinion. (R. 11 at 63-64 (Dr. Wright); 67-68 (Plaintiff); 69 (Plaintiff's husband); 69-70 (Plaintiff's mother); 70 (FMLA approval for time off work; RFC)). The question is whether the ALJ's unorthodox approach discharges his duty to "ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning" in giving little weight to Dr. Kloska. SSR 06-03p, 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006).

The ALJ's trusty copy-and-paste keys do him no service here. As explained above, Dr. Kloska opined that Plaintiff would need to lie down hourly during a competitive 8-hour workday due to pain from her headaches or side effects from medication; he also indicated diagnoses of glomus tumor, depression, anxiety, and vomiting with her headaches. (R. 11 at PageID.776). It is unclear to this reader how virtually *any* of the physical examination results above contradict those opinions, aside from perhaps a lack of acute distress. It seems disingenuous to assert that Plaintiff cannot be suffering severe pain from her headaches if she has, for example, warm skin, or no abnormalities of the thyroid, lungs, or lymphatic system, or a lack of edema. (*Id.*). I see no evidence in the record or explanation in the ALJ's opinion that suggests any different signs would be expected in someone who regularly experiences severe headaches that require her to lie down for relief. Nor do the physical examination results seem to obviously contradict Dr. Kloska's other diagnoses. I suggest, therefore, that this explanation does not satisfy the ALJ's duty to "ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." SSR 06-03p, 2006 WL 2329939, at *6.

This was not the sole reason that the ALJ gave little weight to Dr. Kloska's opinion, however, and I now turn to the others.

### ii.     Inconsistency with Opinions of Other Medical Sources

The ALJ also found Dr. Kloska's opinion inconsistent with the notes of ear, nose, and throat specialist Dr. Scharf and surgeon Dr. Naumann. (R. 11 at PageID.67). Dr. Scharf examined Plaintiff less a month prior to Dr. Kloska's issuing his opinion. (*Id.* at PageID.775). Dr. Scharf noted that some of the glomus tumor was not able to be removed during her most recent surgery, that she no longer had any functional hearing on her right, and that she was a candidate for gamma knife radiation therapy in the future. (*Id.*) At that time, however, Plaintiff had "no significant pain" and only "intermittent pulsatile tinnitus on the left side." (*Id.*). Dr. Scharf expected she would continue seeing her neuro-otologist, Dr. Naumann, and indicated she could return to him "for any acute difficulties in the future." (*Id.*) He made no make any mention of headaches, let alone headaches so severe that Plaintiff would need to regularly lie down or be absent from work.  (R. 11 at PageID.775). He did not propose any functional limitations or voice any expectation that Plaintiff would never be able to return to work.

As for Dr. Naumann's notes, Plaintiff suggests no true inconsistency exists with Dr. Kloska's opinion because "Dr. Naumann's last note was August 2015 and 18 months *before* Dr. Kloska's Medical Source Statement . . . . This was after the *first* tumor removal. However, the tumor returned requiring a *second* surgery on January 30, 2017." (R. 14 at PageID.798). Oddly, however, Plaintiff cites directly to a letter from Dr. Naumann to Dr.

37

Kloska dated not in August 2015 but in January 2017,[7] *after* Plaintiff's second surgery and less than two months prior to Dr. Kloska's issuing his medical source statement. (R. 11 at PageID.703). The letter described her surgery as "uneventful," addressed the ear canal incisions and suture, and explained that Plaintiff would need an MRI scan in 6 to 12 months and Dr. Naumann would "consider Gamma Knife radiosurgery for any recurrent tumor growth in the future." (*Id.*) Plaintiff "was quite pleased at not only her nerves but that also her sigmoid sinus were still in place." (*Id.*). Neither this note nor Dr. Naumann's August 2015 note (*id.* at PageID.513-514) indicated that post-surgery, Plaintiff was expected to continue suffering daily headaches at all, let alone of a severity that rendered her unable to work. Neither suggested any functional limitations imposed by the tumor. At the August 2015 appointment, Plaintiff reported she had not returned to work because she was healing from recent left-foot plantar fasciitis surgery and would soon have the same surgery on her right foot. (*Id.*). She was concerned about her bilateral pulsatile tinnitus, but denied experiencing either nausea or headaches. (*Id.*). I suggest these were appropriate reasons to give less weight to Dr. Kloska's opinion, and that the ALJ's analysis was supported by substantial evidence.

Plaintiff counters that Dr. Kloska's opinion is supported by his own notes indicating he was treating "active problems" of headache, nausea and/or vomiting, otalgia of right ear, and bilateral heel pain, and his prescribing Oxycodone for Plaintiff's "breakthrough"

---

[7] The letter appears to be mistakenly dated earlier than it was actually written. Although it is dated January 12, 2017, it addresses Plaintiff's surgery on January 30. (R. 11 at PageID.703) ("Tracy Miller underwent a glomus tumor resection on January 30th which was quite uneventful.") (R. 11 at PageID.703). The letter was presumably actually penned after January 30, 2017, putting it even closer in time to Dr. Kloska's assessment.

headaches. (R. 14 at PageID.799). Further, she argues, his opinion is consistent with that of neurologist Dr. Meihui Ma and psychologist Dr. Pestrue.[8] (R. 14 at PageID.799-800). Of course, if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.*

As for Dr. Kloska's indication that certain conditions were "active problems," I note that the diagnosis of a condition does not in and of itself compel specific functional limitations. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (citation omitted) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition."); *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 713 (6th Cir. 2013) ("[N]ot every diagnosable impairment is necessarily disabling.").

Further, it is unclear how Plaintiff sees either Dr. Ma's or Dr. Pestrue's records as consistent with Dr. Kloska's medical source statement in any meaningful way. Plaintiff says only that Dr. Ma "performed a neurological examination due to Ms. Miller's problems of Headache with associated nausea. This was ironically confirmed in the [ALJ's] Decision . . . ." (R. 14 at PageID.799). Dr. Ma did record Plaintiff's subjective complaint that she had headaches four days a week, with nausea, and "some pulsation feeling of the ears." (R. 11 at PageID.580). But whether Plaintiff has headaches is not in contention, as the ALJ recognized her headaches as a severe impairment. (R. 11 at PageID.57). And more

---

[8] Plaintiff's reply brief criticizes Defendant for citing examinations by Dr. Ma, Dr. Kloska, and Dr. Pestrue, arguing Defendant is improperly "attempt[ing] to rehabilitate the ALJ's Decision by citing reasons not found in the ALJ's analysis." (R. 16 at PageID.873-874). But it seems Defendant was addressing Plaintiff's own argument that Dr. Kloska's opinion was consistent with examinations performed by Dr. Ma and Dr. Pestrue. (R. 15 at PageID.823-824). That is entirely appropriate.

importantly, Dr. Ma did not speak to their severity, impose any functional restrictions on Plaintiff, voice an expectation that she would need to lie down hourly, or opine that she would be unable to return to work. (*Id.* at PageID.580-581). He started her on a new medication and asked her to follow up in a month; no further appointments with Dr. Ma appear in the record. (*Id.* at PageID.581).

Plaintiff's argument that Dr. Kloska's findings are consistent with Dr. Pestrue's is even less persuasive. She merely quotes at length the section of Dr. Pestrue's report that recites her own subjective complaints[9] in a ringing first-person. (R. 14 at PageID.800) ("I'm just miserable, most days more than not . . . ."). Plaintiff's self-reported symptoms do not become a medical opinion simply because they are faithfully recorded by an examining physician. *See Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) (finding "treating physician [opinion] was not entitled to deference because it was based on Poe's subjective complaints, rather than objective medical data"). The ALJ did not entirely credit Plaintiff's statements about her impairments, (R. 11 at PageID.63), and she did not challenge that credibility determination.

### iii.    Reliance on Plaintiff's Subjective Reports

On a related note, in response to the ALJ's statement that Dr. Kloska's limitations seemed "based substantially on the claimant's own subjective assessment," (R. 11 at PageID.67), Plaintiff argues that her headaches are "clearly documented in the record" and "[h]aving two surgeries in the same area is consistent with Headaches and causing nausea

---

[9] Although Dr. Pestrue performed a mental health consultative examination, the portion of his report that Plaintiff cites is entirely her own report of her physical symptoms (headaches and nausea).

and vomiting." (R. 14 at PageID.798). But subjective complaints are not by third-party documentation transformed into objective observations. *See Poe*, 342 F. App'x at 156.

### iv.   Diagnosis of Headaches; Severe Impairment of Headaches

I note that Plaintiff also attempts to undermine the ALJ's analysis by suggesting it is "inconsistent with his own finding of 'severe' impairments." (R. 14 at PageID.798). Not every severe impairment will be disabling, however, and the finding of a severe impairment does not compel specific functional limitations. *See Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 428-29 (6th Cir. 2007) (quoting *Yang v. Comm'r of Soc. Sec.*, No. 00-10466-BC, 2004 WL 1765480, at *5 (E.D. Mich. July 14, 2003) ("A claimant's severe impairment may or may not affect his or her functional capacity to do work.")); *Corley v. Comm'r of Soc. Sec.*, No. 98-3785, 1999 WL 970306, at *1 (6th Cir. Oct. 14, 1999) (unpublished) ("The ALJ did not err in finding that a severe impairment can exist without also finding that a significant limitation and disability exist. . . . The severe impairment threshold is separate from (and lower than) the disability threshold.").

### v.   Determination Reserved to Commissioner

According to Plaintiff, that the determination of disability is reserved to the Commissioner "is an undisputed fact of law which *only* applies if the ALJ performs a proper 'balancing test' when analyzing the treating source's opinion." (R. 14 at PageID.801). Plaintiff provides no authority for this proposition, and neither I nor Defendant are aware of any. *See* (R. 15 at PageID.819). The § 404.1527 factors are not gatekeeper for the ALJ's authority and responsibility to determine the ultimate question of disability. Statements on issues reserved to the Commissioner are "inherently neither

valuable nor persuasive to the issue of whether you are disabled . . . under the Act, [the ALJ] will not provide any analysis about how we considered such evidence in our determination or decision." 20 C.F.R. § 404.1520b(c), (C)(3)(i). *See Morgan v. Comm'r of Soc. Sec.*, No. 15-12988, 2016 WL 5402940, at *9 (E.D. Mich. July 15, 2016) (prediction that claimant will miss work or be off task not a medical opinion entitled to deference), *Rep. & Rec. adopted*, 2016 WL 5369616 (E.D. Mich. Sept. 26, 2016).

After making the above claim, Plaintiff does not explain further, but launches into an analysis of the ALJ's consideration of the § 1527 factors. (R. 14 at PageID.801). Because Plaintiff never meaningfully contests that Dr. Kloska's opinion intruded on the ultimate question of disability, as reserved to the Commissioner, I suggest she has waived that argument. *See United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995-96) (6th Cir. 1997)).

### vi.    Treating Source Factors

Lastly, Plaintiff accuses the ALJ of improperly evaluating the factors laid out in 20 C.F.R. § 404.1527(c); if the ALJ concludes that a treating source's opinion is not entitled to controlling weight, he must weigh the opinion according to those factors. Plaintiff recognizes that there is no requirement the ALJ explicitly discuss all six factors, (R. 14 at PageID.801), and need only provide "good reasons" for her weighing of the opinion. *See Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 785 (6th Cir. 2017), *aff'd sub. nom. Biestek*

42

*v. Berryhill*, 138 S. Ct. 2677 (2018). Still, Plaintiff maintains that the ALJ erred by not discussing the length of the treatment relationship, frequency of examination, nature and extent of treatment relationship, or specialization; and by improperly analyzing the supportability of the opinion and its consistency with the record. (R. 14 at PageID.801-802).

As explained above, the ALJ properly considered the consistency and supportability of Dr. Kloska's opinion. Further, the ALJ acknowledged that Dr. Kloska was a treating source, but noted that his opinion was inconsistent with treatment notes from specialists like Dr. Scharf and Dr. Naumann. (R. 11 at PageID.67). Plaintiff agrees that Dr. Kloska is a family physician, and does not assert that Dr. Kloska has some specialization that the ALJ failed to recognize—rather, she argues that Dr. Kloska "served as the 'gate keeper' of Ms. Miller's complicated medical condition" because he "referred Ms. Miller to many specialists who in turn supplied reports back to him." (R. 14 at PageID.802). But collecting reports from many specialists does not a specialist make, and Plaintiff presents no authority for that proposition. The ALJ correctly considered that Dr. Kloska was a treating family physician, and afforded him the proper deference. *See* 20 C.F.R. § 404.1527(d)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist.").

And the ALJ explicitly discussed at least some, if not all, of Plaintiff's appointments with Dr. Kloska, (R. 11 at PageID.64, 66-67), suggesting the ALJ considered the treating relationship and frequency of treatment. *See Gothard v. Comm'r of Soc. Sec.*, No. 1:17-cv-

43

13638, 2018 WL 7254254, at * (E.D. Mich. Oct. 10, 2018) (finding ALJ demonstrated consideration of length and nature of treatment relationship by describing treatment history in detail), *Rep. & Rec. adopted*, 2019 WL 396785 (E.D. Mich. Jan. 31, 2019).

Even setting the factors aside, I suggest that all the previously discussed reasons amount to "good reasons" for the ALJ to give little weight to Dr. Kloska's opinion, and remand is unwarranted on this basis.

### vii.    Harmlessness

Lastly, I suggest that any error would be harmless because Dr. Kloska's Medical Source Statement is a check-box opinion with a marked lack of narrative analysis. (R. 11 at PageID.776). *See Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 566-67 (6th Cir. 2016) (internal citations omitted) ("Many courts have cast doubt on the usefulness of these forms and agree that administrative law judges may properly give little weight to a treating physician's 'check-off form' of functional limitations that 'did not cite clinical test results, observations, or other objective findings . . . .'"); *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474-75 (6th Cir. 2016) ("Even if the ALJ erred in failing to give good reasons for not abiding by the treating physician rule, it was harmless error because the [medical source statement] here is 'weak evidence at best' and meets our patently deficient standard." (citing *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 542, 551 (6th Cir. 2010)); *Rogers v. Comm'r of Soc. Sec.*, 225 F.3d 659, 2000 WL 799332, at *1, *6 (6th Cir. 2000) ("[T]he ALJ had ample reason not to credit [the treating physicians'] reports. Both reports consist simply of forms in which spaces are filled out and boxes are checked off. Neither explains how the authors arrived at their diagnoses."). Courts in this circuit have held that

44

ALJs are not bound by conclusory statements of doctors where they appear on "check-box forms" and are unsupported by explanations citing detailed objective criteria and documentation. *See, e.g.*, *Khreiss v. Comm'r of Soc. Sec.*, 2018 WL 5095051, at *8 (E.D. Mich. Sept. 6, 2018) (The treating physician's "check-box opinion contained no narrative explanation as to why his notes led him to the conclusions he reached, rendering his findings without evidentiary support in the record and, therefore, [undeserving] of more weight."), *Rep. & Rec. adopted*, 2018 WL 4610863 (E.D. Mich. Sept. 26, 2018); *Bayes v. Berryhill*, No. 3:16-cv-2822, 2018 WL 791323, at *2 (N.D. Ohio Feb. 8, 2018) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best." (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993))); *Nichols v. Berryhill*, No. 16-14072, 2018 WL 2181463, at *3 (E.D. Mich. Jan. 25, 2018) ("Courts in this circuit have held that a medical source statement in 'check-the-box' format, by itself, provides little to no persuasive value — to hold otherwise would neglect its glaring lack of narrative analysis.") (citation and quotation omitted); *Ashley v. Commissioner*, No. 1:12-cv-1287, 2014 WL 1052357, at *8 n.6 (W.D. Mich. Mar. 19, 2014) ("Courts have increasingly questioned the evidentiary value of 'multiple choice' or 'check-off' opinion forms[.]").

Here, Dr. Kloska's Medical Source Statement spans a single page and comprises almost entirely check-box and fill-in-the blank answers. (R. 11 at PageID.776). Even where he expounds for more than two words, his answers could hardly be called "narrative." Asked when he anticipated Plaintiff's being able to return to work, he said: "No return in site [sic] due to unresectable glomus tumor"—essentially repeating her diagnosis (glomus

tumor) without explaining why it would prevent her from returning to work, what functional limitations it caused, or what treatments she was undergoing or would need to undergo. (*Id.*). Similarly, her 12-month prognosis was "[g]uarded due to the tumor touching her carotid." (*Id.*). I suggest his opinion is cursory enough that any error by the ALJ in affording his opinion "little weight" was harmless.

## 2.  Plaintiff's Mental Impairments

Plaintiff next avers that the RFC fails to account for Plaintiff's mental impairments of depression, anxiety, and PTSD. (R. 14 at PageID.803). Those three impairments, which the ALJ determined were "severe" at Step Two, "clearly were not factored in the RFC. There was nothing contained within the RFC that portrayed the mental impairments. The hypothetical fails to list any nonexertional mental restrictions whatsoever," Plaintiff says, "in violation of well-established Sixth Circuit case law." (R. 14 at PageID.804) (citing *Varley v. Comm'r*, 820 F.2d 777, 779 (6th Cir. 1987); *Cole v. Comm'r*, 820 F.2d 768, 776-77 (6th Cir. 1987)).

But Plaintiff's RFC—which is presumably what Plaintiff meant by "hypothetical"—includes several nonexertional restrictions to account for Plaintiff's mental impairments. Nonexertional capacity "considers all work-related limitations and restrictions that do not depend on an individual's physical strength; i.e., all physical limitations and restrictions that are not reflected in the seven strength demands, and mental limitations and restrictions." SSR 96-8p, 1996 WL 374184, at *6. That includes communicative activities like hearing and mental activities like understanding and remembering instructions and responding appropriately to supervisors. *Id.* Here, the ALJ

46

limited Plaintiff to "hearing and understanding simple oral instructions," and found her "able to understand, carry out, and remember simple instructions, make simple work related decisions, and frequently interact with supervisors, co-workers and the public." (R. 11 at PageID.62). Those are all nonexertional limitations.

Plaintiff then argues the ALJ's opinion fails to comply with S.S.R. 96-8p because "there was no attempt to tie the nonexertional mental portion with any evidence of case record, particularly that of Dr. Pestrue." (R. 14 at PageID.804). That Ruling requires the ALJ's RFC assessment to include "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." S.S.R. 96-8p, 1996 WL 374184, at *7 (July 2, 1996). Here, the ALJ explained that the evidence of depression, anxiety, and PTSD—as well as Plaintiff's testimony regarding her physical pain and possible side effects of her medication—"warrant[ed] a limitation to simple instructions, simple decisions, and reduced social interaction." (R. 11 at PageID.71).

Further, earlier in the opinion, at Step Three, the ALJ explained at length his reasoning regarding limitations caused by Plaintiff's mental limitations. (R. 11 at PageID.60-61). For example, he found her to have moderate limitations in understanding, remembering, or applying information because, while she testified to significant mental health limitations, she did not require reminders for medication, personal care, or going places; she managed her finances, which demonstrated an ability to use and apply information; she was able to provide an examiner with detailed personal, school, work, marital, substance, and legal history; and testing showed good memory. (*Id.* at PageID.60).

47

"In balance and giving the claimant the benefit of the doubt," the ALJ therefore found the record supported moderate restriction in that area. (*Id.*). In sum, I suggest the ALJ included sufficient narrative explanation here to satisfy SSR 96-8p.

Also relevant: Plaintiff does not suggest what additional nonexertional limitations the ALJ should have included in her RFC to account for her mental impairments. *See Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008) (the claimant bears the burden of demonstrating the need for a more restrictive RFC). She does not, for example, explain how any of her mental impairments preclude her from understanding, carrying out, and remembering simple instructions, or making simple work-related decisions. *See Turvey v. Comm'r of Soc. Sec.*, No. 12-12388, 2013 WL 3271194, at *5 (E.D. Mich. June 27, 2013) ("Plaintiff does not specify any additional work-related functional limitations the ALJ should have, but did not, include in the RFC assessment . . . ."); *Carlin v. Comm'r of Soc. Sec.*, No. 12-10222, 2013 WL 639338, at *10 n. 2 (E.D. Mich. Jan. 11, 2013) ("Plaintiff does not specify what restrictions the ALJ did not include in the RFC. Accordingly, this Magistrate Judge finds Plaintiff's argument is waived.") (internal citations omitted), *Rep & Rec. adopted*, 2013 WL 639147 (E.D. Mich. Feb. 21, 2013).

In Plaintiff's brief, she simply points to her "consistent treatment history" with Dr. Kloska for depression and anxiety, that she takes medication for her depression, and that Dr. Pestrue characterized Plaintiff's mood as "strongly depressed," and found her to have "rather poor" self-esteem. (R. 14 at PageID.804-806). But neither Dr. Kloska's opinion, nor Dr. Pestrue's, nor any other medical opinion in the record suggested specific functional limitations required by Plaintiff's mental impairments. And when Plaintiff and her husband

48

completed function reports in February 2015—less than three months before her evaluation by Dr. Pestrue—neither indicated she had any limitations with memory, completing tasks, concentration, understanding, following instructions, or getting along with others. (*Id.* at PageID.236, 248).

As the ALJ noted, Dr. Pestrue's mental status examination showed that Plaintiff was friendly and cooperative, with a normal tone, pace, and volume of speech; clear articulation; adequate contact with reality; fair insight; a spontaneous stream of mental activity; no hallucinations or delusions; no obsessive or compulsive behavior; no suicidal ideation; good immediate and delayed memory; a good fund of knowledge; good ability to perform calculations and on serial 7s; good abstract thinking; good judgment; and clean clothing and good hygiene. (*Id.* at PageID.493-495). And although her depression left her "tired and lacking in motivation," she told him her physical problems were her primary disability. (*Id.* at PageID.496).

For all the above reasons, I suggest substantial evidence supports Plaintiff's RFC as it relates to her mental impairments.

Based on a confused reading of the hearing transcript, however, Plaintiff suggests that her case is marred by "clear reversible error." (R. 14 at PageID.803-804). She understands the VE to have "specifically testified that the . . . hypothetical"—presumably referring to the hypothetical that matches her RFC—"reflects a worker who is unimpaired mentally." (R. 14 at PageID.803). That is not so.

Plaintiff's concern is based on her attorney's brief questioning of the VE, which I reproduce here in its entirety:

49

Q      On the nonexertional portion[10] about simple work related instructions, I think it was frequent contact with coworkers and supervisors?

A      And public, all people.

Q      Is that basically unskilled work then?

A      I don't quite understand that.

Q      In other words, could an unimpaired mentally—I don't mean, maybe I'm stretching the envelope, but could a person who is not unimpaired mentally perform that work?

A      Yes, I believe so.

(R. 11 at PageID.113-114).

As an initial matter, it appears the attorney misspoke, and intended to ask whether a person who is *unimpaired mentally* could perform the work, rather than a person who is "not unimpaired mentally"—which would be someone "impaired mentally," once the double negatives are removed. Assuming that is the case, and the VE also understood that to be the question, then the VE testified that *a person who is unimpaired mentally*—a person with *no* restrictions due to mental impairment—could perform the jobs the VE had listed. This seems common sense. It follows that someone with *fewer* limitations than in the original hypothetical could perform the same work.

Now let us assume the attorney spoke correctly, or the VE took the attorney literally, and thus answered that yes, a person who is impaired mentally ("not unimpaired mentally")

---

[10] The "nonexertional portion" to which the attorney refers appeared in the first hypothetical, and was incorporated into the second, third, and fourth hypotheticals by reference; Plaintiff's RFC matches the third hypothetical. (R. 11 at PageID.107-113).

50

could do "that work." Again, this hardly helps Plaintiff if she is arguing she could *not* perform the work due to mental impairments.

Regardless, the attorney's intent does not much matter. The reader will notice that nowhere did the VE say that any of the hypothetical RFCs posed by the ALJ described someone with no mental limitations. Nor did the attorney ask that question. I see no error; the fact remains that the ALJ posed a hypothetical with all the limitations that are in Plaintiff's RFC, including non-exertional limitations to account for Plaintiff's mental impairments, and the VE testified that someone with that RFC could perform sedentary work. (R. 11 at PageID.107-112). I suggest the court reject Plaintiff's argument.

### 3.  Letter from Plaintiff's Mother

Lastly, Plaintiff argues the ALJ failed to meaningfully consider the letter submitted by Plaintiff's mother, which I described above. Plaintiff goes so far as to say, "A clear reading of the ALJ's Decision demonstrates it [the letter] was never considered. It was a boilerplate statement with no analysis whatsoever." (R. 16 at PageID.877). This runs contrary, Plaintiff says, to SSR 06-03p and SSR 96-7p. (R. 14 at PageID.806). These two rulings "follow the Commissioner's principle that witnesses *are* important to a disability determination," and it is "highly inappropriate to subject a lay witness to that [sic] of a medical professional." (R. 14 at PageID.807-808).

Defendant responds—correctly—that SSR 96-7p does not apply to the consideration of other sources, but rather controls the analysis of statements by the claimant about their own symptoms. (R. 15 at PageID.832) (citing SSR 96-7p, 2017 WL 5180304, at *1-2). And Defendant argues the ALJ's analysis complies with SSR 06-03p, because the

51

ALJ considered the letter and explained the weight he gave it. (*Id.* at PageID.832-833). Defendant additionally notes that the letter mirrors Plaintiff's subjective complaints, (*id.* at PageID.833-834), which the ALJ discounted, (R. 11 at PageID.63). Plaintiff did not challenge her credibility analysis.

Evidence provided by other non-medical sources, including parents, is considered evidence from "other sources." 20 C.F.R. § 404.1513(d)(4). As explained above, opinions from acceptable medical sources undergo a six-factor analysis. *See* 20 C.F.R. §§ 404.1527(c) (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927(c) (eff. Aug. 24, 2012 to Mar. 26, 2017). The regulations do not, however, explicitly address how to consider "other source" opinions. The agency sought to provide some clarity in the 2006 Ruling on which Plaintiff relies, which noted that ALJs were required to consider all evidence in the case record, including other source opinions, and suggested the balancing factors for "acceptable" sources could also be applied to other sources. SSR 06-03p, 2006 WL 2329939, at *2, 6 (Aug. 9, 2006).

Neither the Ruling nor the regulations make clear to what extent the ALJ must explain his or her evaluation of an other-source opinion. The Ruling advises that

> [a]lthough there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

*Id.* Sixth Circuit caselaw, meanwhile, suggests that an ALJ should explicitly discuss "other source" opinions, or at least provide reasoning that shows the ALJ considered the

substantive elements of the opinions. In *Cruse*, the court found that SSR 06–03p requires an ALJ to examine these other-source opinions, but declined to apply the rule retroactively. *Cruse*, 502 F.3d at 541–42. The Sixth Circuit has since reiterated the reasoning used in *Cruse*. *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 550 (6th Cir. Mar.27, 2014) (noting that an ALJ should explain his or her assessment of "other sources"); *Cole v. Astrue*, 661 F.3d 931, 939–40 (6th Cir.2011) (finding that ALJ failed to "consider" an "other source" opinion by not mentioning it in the decision).

The Commissioner and many courts note that "other sources" are generally given less weight than "acceptable" sources. SSR 06–03p, 2006 WL 2329939, at * 5 ("The fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' . . . ."); *Dunmore*, 940 F.Supp.2d. at 685 ("[T]he regulation [20 C.F.R. § 404.1513] . . . allows the ALJ to give greater weight to 'acceptable medical sources' who are recognized as more-qualified healthcare professionals."); *Strevy v. Comm'r of Soc. Sec.*, No. 1:12–cv–634, 2013 WL 5442803, at *7 (W.D. Mich. Sept. 30, 2013) ("The opinions of such acceptable medical sources are entitled to greater weight than the opinion of a non-acceptable source . . . .").

Here, the ALJ gave the opinions of Plaintiff's mother "little weight" because she "lacks the medical training necessary to make exacting observations as to dates, frequencies, types, and degrees of medical signs and symptoms or the frequency or intensity of unusual moods or mannerisms," and because her opinions "are inconsistent with the objective medical evidence and medical opinions of record." (R. 11 at PageID.69).

53

Specifically, the ALJ says—repeating what may be a familiar refrain—examinations showed no acute distress; no abnormalities of the neck, thyroid, lungs, heart, abdomen, or lymphatic system; normal pedal pulses; warm skin; normal and symmetrical pinprick, vibration, light, and temperature sensation; normal deep tendon reflexes; normal posture; no muscle wasting, edema, cyanosis, or clonus; intact cranial nerves; no tremors; no atrophy; normal motor strength in the upper and lower extremities; normal coordination; ability to tandem walk; negative Romberg; and normal gait. (*Id.* at PageID.69-70) (citing R. 11 at PageID.481-482, 483-484, 613-614, 616-618, 653, 692-694).

First, the very Ruling that Plaintiff cites contemplates that "[w]hether the source has a specialty or area of expertise related to the individual's impairment(s)" would be an appropriate factor to consider. SSR 06-03p, 2006 WL 2329969, at *4. Yet if ALJs could automatically dismiss every "other source" opinion not backed by medical training, that would seem to run contrary to the mandate that ALJs consider opinions from "other sources." That the ALJ does not use the same rationale against Plaintiff's husband, who also provided an "other source" opinion, suggests to this reader that the ALJ discounted her mother's opinion because she failed "to make exacting observations as to dates, frequencies, types, and degrees of medical signs, and the symptoms of the frequency or intensity of unusual moods or mannerisms," and not merely because she lacked medical training. (R. 11 at PageID.69).

Regardless, the ALJ also explicitly based his weight assignment on "[h]ow consistent the opinion is with other evidence," another factor from the Ruling. SSR 06-03p, 2006 WL 2329969, at *4, 6. Like before, some of the physical examination findings

the ALJ presents as contradictory seem irrelevant—for example, that Plaintiff had warm skin, or no abnormalities of the neck—but here, the great majority tend to contradict the assertions of Plaintiff's mother that her foot pain was so severe she sometimes could not stand or walk. (R. 11 at PageID.263-265). For example, Plaintiff was regularly observed to be in no acute distress, *e.g.*, (*id.* at PageID.311, 316, 391, 393, 435, 526, 532, 580, 721), with the ability to tandem walk, (*id.* at PageID.581), and a normal gait, (*id.* at PageID.434, 436, 505, 628, 662, 652), *cf.* (*id.* at PageID.596 (mild limping on left prior to left plantar fasciitis surgery); 614 (slow gait); 659 (limping on right due to plantar fasciitis, prior to surgery); 651 (limping due to plantar fasciitis, prior to surgery); 664 (same)). I suggest this is sufficient reason to give less weight to the letter from Plaintiff's mother.

For the above reasons, I suggest any error is harmless, and remand is not warranted on this basis.

### H. Conclusion

For the reasons stated above, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment, (R. 14), be **DENIED**, the Commissioner's Motion for Summary Judgment, (R. 16), be **GRANTED**, and this case be **AFFIRMED.**

## III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections

55

constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: June 11, 2019                    S/ PATRICIA T. MORRIS
                                       Patricia T. Morris
                                       United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: June 11, 2019                    By s/Kristen Castaneda
                                       Case Manager